

**SO ORDERED.**

**SIGNED this 20 day of September, 2012.**

*Stephani W. Humrickhouse*
_____
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

IN RE:                                                                          CASE NO.

**BATH BRIDGEWATER SOUTH, LLC**                            **11-06817-8-SWH**

      **DEBTOR**

### ORDER REGARDING DISCLOSURE STATEMENT
### AND DETERMINATION OF EXISTENCE OF IMPAIRED CLASS

The matter before the court is the confirmation of the chapter 11 plan of reorganization filed by the debtor on December 5, 2011, to which creditor Capital Bank, NA ("Capital") filed an objection. Confirmation hearings began on January 26, 2012, and were carried over on February 6, 2012; May 15-17, 2012; and June 11, 2012. Upon the conclusion of the hearings and at the request of the court, the debtor and Capital submitted post-hearing briefs in lieu of closing arguments. For the reasons that follow, the disclosure statement will be approved. However, the court will require supplemental documentary evidence from the parties in order to complete its analysis of whether Capital has a deficiency claim which would, if determined in the affirmative, defeat the existence of an impaired accepting class.

## BACKGROUND

The debtor, Bath Bridgewater South, LLC, is a North Carolina limited liability company engaged in the business of owning and developing residential real property subdivisions in Bath, North Carolina. The debtor's schedule A lists real property divided among three subdivisions known as Catnip Estates, Bath Bridgewater South, and Bath Bridgewater West.[1] The properties serve as security for a promissory note executed by the debtor on July 6, 2006, in favor of Capital, in the principal amount of $3,850,000, along with the Bridge Lot.

On September 6, 2011, at a point when the debtor faced foreclosure, the debtor filed its petition under chapter 11. The debtor scheduled its real property assets at $8,744,500 with encumbrances of $3,482,354.03. Capital filed a proof of claim on October 7, 2011, in the amount of $2,587,936.85. During the hearing, Capital presented an exhibit in which it modified its position as to the amount due on the petition date to $2,760,939.64.

Capital has objected to the sufficiency of the disclosure statement and to confirmation. Although Capital objected to confirmation on several grounds, the court will, at this juncture, only deal with its objection on the grounds that there is no accepting impaired class, and thus no ability to proceed with cram down regarding the debtor's plan.

The debtor seeks confirmation pursuant to § 1129(b), the cram-down provision of the Bankruptcy Code. However, the court must first consider the threshold issue of whether there is an accepting impaired class which would allow the court to apply the cram-down standards. Inasmuch as the debtor believes that Capital is oversecured, it has not provided a class for a Capital deficiency

---

[1] The debtor also lists a 1200-square-foot store and marina known as the "Quarterdeck Marina" and a 1.2 acre vacant lot located off Highway 92 (the "Bridge Lot").

claim. The debtor has indicated that it is willing to surrender as much of its property as necessary, exclusive of excepted property,[2] to satisfy the secured claim of Capital.  If the value of all of the offered property is sufficiently high such that it is equal to or greater than the amount of Capital's claim, Capital will have no deficiency, and an accepting impaired class exists: Class 6, which includes all general unsecured claims in the approximate amount of $53,179.05.  If, however, some part of Capital's claim is unsecured, that portion will be added to the general unsecured claims, and an amount as low as $27,000 would, under § 1126, enable Capital to carry the Class 6 vote and to reject the plan.  In that event, there would be no accepting impaired class as required by 11 U.S.C. § 1129(a), and the court could not proceed to an analysis under § 1129(b) without modification of the plan.

        To determine whether there is an impaired accepting class capable of forcing the matter to cramdown, the court need only consider valuation testimony to the extent necessary to determine the existence of any deficiency claim in excess of $27,000.  Capital's position is that even if the debtor surrendered *all* of the properties securing the debt, there still would be a deficiency.  The debtor counters that surrender of the Bridge Lot (which the parties agree has a value of $350,000 for credit purposes) and the remaining lots in Bridgewater South serving as Capital collateral (excepting Lot 21) will fully satisfy Capital's claim.  If the court finds otherwise, the debtor has offered additional properties for surrender:

> The Plan (as clarified during the confirmation hearing) proposes to satisfy Capital's large claim – designated as "(a)" in the Plan and referred to as "account ending in 8427 – by deeding properties to Capital, free and clear of all liens, in the following

---

    [2] The debtor has excepted Lot 21 of Bridgewater South from its surrender treatment of Capital's secured claim resulting from Note 1.

order, up to the amount necessary to fully satisfy Capital's large claim and thereby give Capital the indubitable equivalent of this claim:

    a.    1.2 acre parcel on Highway 92 (the "Bridge Lot");
    b.    Lots in Bridgewater South, with the exception of Lot 21;
    c.    Lots in Catnip Estates;
    d.    Excess land in Catnip Estates; and
    e.    Bridgewater West land.

Debtor's Summary of Evidence and Closing Arguments at p.1 ¶ 4.[3]

## DISCUSSION

### I.    Adequacy of Disclosure Statement

The court turns first to Capital's objection to the adequacy of the disclosure statement, the gist of which is that Capital argues that the debtor does not identify, in advance, precisely which of the properties it intends to surrender, and leaves unanswered important questions about the debtor's intentions for the property it proposes to retain. Objection of Capital Bank to Debtor's Disclosure Statement at p. 7 ¶ 26. In its post-confirmation summary, Capital's objection boiled down to what it sees as the debtor's failure to provide essential terms relating to timing, manner, and method of property transfer, and to address questions relating to the disclosure of "Association or declarant rights, or obligations that will be transferred or retained." Capital Overview of Pertinent Evidence & Final Arg. at p. 1.

The debtor emphasizes that it will surrender as many of the identified properties as may be necessary to satisfy Capital's claim, and argues that because Capital is a sophisticated creditor (and

---

[3] In its plan, the debtor proposed to surrender property only through the Phase 1 lots of Catnip Estates (a.-c., above), but now proposes a more extensive surrender if it should prove necessary.

voter) capable of determining the value of the properties proposed for surrender, the debtor's methodology poses no problems here.   In its plan, the debtor proposes the following treatment:

> (a).  The Debtor will treat the Claims of Capital as a secured obligation in an amount equal to (1) all outstanding principal and interest due on the Petition date; plus (2) costs and expenses approved by the Court pursuant to § 506(b); less (3) any post-Petition payments.  The creditor shall retain its liens with the priorities thereof, as existed on the Petition Date pursuant to § 1129(b)(2)(A)(i)(I) of the Bankruptcy Code, until its claim is satisfied in full.  The debtor has obtained a new appraisal of the Properties securing the Claims.  The debtor shall surrender the 1.2 acre parcel on Highway 92 for a credit of $350,000.  Additionally, the Debtor shall surrender sufficient lots in the Bridgewater South subdivision, excluding Lot 21.  If additional property is required to give Capital the indubitable equivalent of its claim, the Debtor shall surrender lots in Phase 1 of Catnip Estates.  The Debtor shall retain all of its remaining real property free and clear of the claims of Capital.

Debtor's plan at p. 6 ¶ (3)(a).  As noted above, the debtor clarified during the hearing that it would, if necessary, surrender properties in addition to those specifically identified in the Plan.   The debtor's obligations regarding the contents of a disclosure statement are set out in 11 U.S.C. § 1125(a)(1), which defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information . . . .

The determination of "whether the disclosure statement has adequate information is made on a case by case basis and is largely within the discretion of the bankruptcy court." Menard-Sanford v. Mabey (A.H. Robins Co.), 880 F.2d 694, 696 (4th Cir. 1989); see also In re Ferguson, 474 B.R. 466,

471 (Bankr. D.S.C. 2012) ("It is within the Court's discretion to determine whether a disclosure statement contains adequate information.").

In this case, whether the plan can be crammed down over Capital's objections depends in significant part on the value assigned to the properties, which will ultimately be derived after the court's review of the appraisals and related testimony presented by both parties. The appraisals and testimony address a wide array of interrelated issues that pertain to marketing, exposure and absorption rates, future development opportunities and the costs and risks associated with them, and so forth. All of these factors are relevant to Capital, but none of them can be covered, *in the context of a disclosure statement*, with the kind of specificity requested. Most importantly, Capital has access to much of the same information available to the debtor, and has, in fact, separately evaluated that information in formulating its position as to the plan.

Capital's objections are well-founded in that "the disclosure statement could have included more information," but, "a disclosure statement need not be perfect and may be approved if the information is reasonable in the circumstances." In re Price Funeral Home, Inc., 2008 WL 5225845 at *2 (Bankr. E.D.N.C. 2008) (pointing out that the creditor bank had "sufficient information to make an informed decision with respect to the plan, and, in fact, even if more information had been provided, [the bank] would still have voted against [the plan]."). Capital is a sophisticated voter and has all of the information it presently needs to make an informed decision about its position with respect to the confirmability of the plan, and to challenge any aspect of the plan with which it disagrees. The disclosure statement is adequate and is approved.

**II.      Preliminary Valuation Question and Existence of Accepting Class**

Capital points out, correctly,  that the property valuations offered by its appraiser, Matt Hawk, are "drastically different" from the valuations offered by the debtor's appraiser, Karen Cross. The extreme differential does not, however, preclude valuation.  It is a fact that the properties have a fair market value.  It also is a fact that determining what that value *is*, can be difficult. A third fact is this: The court has a duty to value property pursuant to § 506, that duty is not limited to those instances where valuation is easy or uncontested, and that duty encompasses those instances where the economy is uncertain and comparable sales are scarce.  The fact that two appraisers have arrived at vastly different values cannot relieve the court of its obligation.   Therefore the court will determine a fair market value number for the property offered for surrender in the debtor's plan in satisfaction of § 506.

Upon that determination, a simple mathematical calculation will resolve whether Capital does or does not have a deficiency claim.  Different issues are presented to the court if the debtor can then proceed to cramdown under § 1129(b): indubitable equivalence, and whether the treatment of the lender is fair and equitable.  So, while the court may determine that a deficiency does not exist for § 1129(a) purposes, it is conceivable that the surrender of property may not satisfy § 1129(b). Because the court requires additional information to determine the § 506 issue, it cannot and will not reach the § 1129 issue in this order.

 With that in mind, the court turns to the  primary initial confirmation question before it, which is whether the § 506 value of the property securing Capital's claim exceeds the amount of the claim.  The first step in that analysis is the setting of Capital's claim under Note 1.  Capital filed a proof of claim in the amount of $2,587,936.05.  No objection was filed to that claim.  Capital orally

amended its proof of claim at the hearing, and the debtor agreed to the use of that amended figure for the court's determination of the existence of an impaired accepting class but reserving the right to object for all other purposes.  Accordingly, for the limited purposes of this order, the court shall deem the secured claim of Capital to be in the amount of $2,760,939.64.[4]  A determination of whether Capital is entitled to post-petition interest must be deferred until the court decides whether or not Capital is fully secured.  11 U.S.C. § 506(b).

To reiterate: the debtor proposes to surrender, in full satisfaction of Capital's claim, real property known as the "Bridge Lot" (as to which the parties have stipulated a value of $350,000) and also all of the remaining lots in Bridgewater South securing Capital's Note 1 indebtedness, with the exception of Lot 21.  The values assessed for the Bridgewater South subdivision range from $850,000 for the as-is market value of 19 lots by appraiser Matt Hawk, on behalf of Capital, to $2,580,000 (including a deduction for entrepreneurial profit) or $2,970,000 (without an entrepreneurial profit deduction), as determined by appraiser Karen Cross on behalf of the debtor.[5]  See Capital's Collateral Value Comparison Chart attached to the Overview of Pertinent Evidence

---

[4] The debtor asserts that it also owes an additional claim to Capital which consists of the remaining balance owing on a promissory note executed by the Baldwin Irrevocable Family Trust ("the Trust") in favor of Capital, in the amount of $200,000, on February 10, 2011.  Those funds were used to build a "spec house" on Lot 4 in Catnip Estates, and the Trust executed a deed of trust giving Capital a security interest in the improved lot (the "Spec House Note").  Although a deed transferring the property from the Trust to the debtor was executed pre-petition, recordation of the deed did not occur until after the petition was filed.  Nevertheless, the debtor scheduled the debt in the amount of $199,092.03 and treats the claim under the plan.  For purposes of this order, the Spec House Note claim will not be included in the analysis because the debtor seeks to treat that claim separately through an orderly marketing/restructuring of indebtedness, and not with the surrender of property.

[5] The Cross valuation of Bridgewater South includes Lot 29, which, according to Capital, was released by Capital in June 2007.  Both the Cross and Hawk valuations include Lot 21, which the debtor proposes to retain. In the final analysis, the court's determination of value will exclude both lots 21 and 29.

and Final Argument (capturing at a glance the wide disparity between these appraisals). Inasmuch as the debtor contends that the value of the Bridge Lot and Bridgewater South (exclusive of Lot 21) is equal to or exceeds the amount of Capital's claim, the court will evaluate Bridgewater South's appraisals and other evidence of value first. If the court agrees with the debtor, there will be no need for further valuation at this juncture.

With regard to § 506 valuation, the court considered the testimony of Matt Hawk (appraiser for Capital); Karen Cross (appraiser for debtor); R. Earl Jones (review appraiser for Capital); John Baldwin (principal of the debtor); Stanley Armstrong (listing agent for Capital) and James Gurley (advisor to Capital). The vast difference between the value conclusions of Capital and debtor's appraisals can be attributed to the following input categories, which were included in the respective discounted cash flow analysis contained in those appraisals:

1. <u>Designation as Waterfront or Non-Waterfront.</u> Mr. Hawk identifies only 6 of the lots as waterfront lots, and ascribes to them a $175,000 value. Ms. Cross designates all but one of the lots as being either premium waterfront, waterfront or water access lots. She allocates values of $231,294 - $157,500 for those lots.

2. <u>Absorption Rate</u>. Mr. Hawk uses a 6 year (one lot per year) absorption period for waterfront lots and a six and one quarter year (two lots per year) absorption period for non-waterfront lots. Ms. Cross uses a 4-year absorption period for both types of lots.

3. <u>Discount Rate</u>. Ms. Cross employs an 11% discount rate, and would use a 12% entrepreneurial profit rate, if applicable. Mr. Hawk does not differentiate between the discount rate and entrepreneurial profit and uses a combined rate of 25%.

4.    <u>Escalation</u>.  Although Ms. Cross applies a 2% per year escalation in value after the first 2 years of sales, Mr. Hawk does not use any escalation in value over the absorption period in his analysis.

With regard to expenses, the parties are very close.  Ms. Cross uses a 6% selling fee and 3% miscellaneous fee, whereas Mr. Hawk uses a 6% broker's fee and a 1% miscellaneous fee, but also expenses real estate taxes at an amount that approximates 2.5%.

The waterfront/non-waterfront designation was perhaps the most hotly disputed issue during the confirmation hearing.  Mr. Hawk opined that only six of the lots warranted the esteemed waterfront designation and correspondingly higher valuation: 19, 21, 25, 26, 27, and 28.  Lot 21 has been excepted from surrender by the debtor and, therefore, Mr. Hawk would only find five of the lots to be waterfront.  On the other hand, Ms. Cross deems all but one lot, Lot 54, to have water frontage on either Bath Creek, Adams Creek or the gut.  She does divide the waterfront lots into three categories:

Tier One - Lots 19, 21, 25, 26, 27, 28, 29, 30, and 31 (nine lots). These lots are described as premier waterfront lots with high elevations, old growth trees and excellent water depth and views;

Tier Two - Lots 33, 34, 35, 36, 37, and 38 (six lots).  These lots are described as having good elevations, water frontage and depth, and the potential of constructing a private dock; and,

Tier Three - Lots 13, 39, 40 and 41 (four lots).  These lots are described as having water frontage, but being located further up Adams Creek and the gut, with less water depth and width than the other lots.

Since Lot 21 has been removed from the surrender proposal and Lot 29 was released by Capital, the court will only consider seven lots as Tier One lots. Both appraisers agree that Lot 54 is non-waterfront.

The court is persuaded by Ms. Cross' designation of waterfront/non-waterfront lots. She visited the lots on several occasions and boated up and down the relevant waterways. Mr. Earl Jones, who performed a review of her appraisal for Capital, concedes that the lots designated by Ms. Cross as Tier One through Tier Three all have waterfront views and access, although some have more limited views and access than others. But the most persuasive evidence of the waterfront quality of these lots is the video introduced by the debtor depicting the debtor's principal and his family tubing up and down the waterways at fairly high rates of speed. If a 24-foot inboard motor boat can run up along a lot while maintaining a speed adequate to provide a successful tubing experience to teenagers, the court will take judicial notice of the fact that such a lot is waterfront. A picture is indeed worth a thousand words.[6] A video may be worth more.

By contrast, Mr. Hawk made no distinction between Lot 54, an interior lot, and lots located along Adams Creek and the gut. He testified that in his opinion tubing in front of his designated non-waterfront lots was not possible. He admitted that he had never tried to navigate Adams Creek in a boat and that he was not aware that a dock had been built off of Lot 42 adjacent to Lot 41, which he designated as non-waterfront. Mr. Gurley's testimony will be given very little weight by the court on this issue: he only visited Bath once, and his testimony regarding lot designation was confused and inconsistent.

---

[6] Although there is some debate as to the origin of this quote, most attribute it to Fred R. Barnard, an editor of the "Printer's Ink," where it appeared in the December 8, 1921 publication.

For purposes of valuation of the Bridgewater South lots, the court will adopt the categories developed by Ms. Cross with the qualification that Lots 21 and 29 will be omitted, the result being seven Tier One lots, six Tier Two lots, four Tier Three lots and one interior lot.

Ms. Cross' absorption period of four years translates into four-and-one- half lots per year. Applying the determined lot designation to Mr. Hawk's absorption analysis, there would be a one year absorption for non-waterfront lots and a 17-year absorption for waterfront lots, although the court recognizes that the change in designation might very well change Mr. Hawk's opinion on absorption. Mr. Gurley proposed a 5-year absorption period, but it is unclear to the court whether that period is the result of analysis or the fact that according to federal regulations, a bank has to sell real property within five years of taking possession of it, according to Mr. Gurley. Mr. Jones endorsed a 48-month absorption period "if the lots are competitively priced with the competing subdivisions," and "if the market rebounds as projected by the appraiser." The court interprets Mr. Jones' statement to mean that he has no real quarrel with Ms. Cross' absorption rate. The court will adopt the 4-year absorption period.

A discussion of the appropriate discount rate most necessarily involves a determination of whether an additional or combined discount for entrepreneurial profit is warranted regarding the property in question. The evidence is undisputed that Bridgewater South is completely developed. Therefore, for the reasons set forth and fully discussed in the Bannerman and Sailboat Properties[7] decisions, a discount for entrepreneurial profit is not appropriate in this case. The court believes that

---

[7] See In re Bannerman Holdings, LLC (Sun Trust Bank v. Bannerman Holdings, LLC), Case No. 7:11-CV-00009-H  (E.D.N.C. Sep. 30, 2011) (discussing and reversing, in part, Bannerman, 2010 WL 4260003 (Bankr. E.D.N.C. 2010); In re Sailboat Properties, LLC, 2011 WL 1299301 (Bankr. E.D.N.C. 2011).

any remaining risk resulting from the marketing effort is adequately included in the discount rate. Ms. Cross uses an 11% discount rate; Mr. Hawk uses a 25% combined discount and entrepreneurial profit rate and does not break the rate into component parts.  Inasmuch as Ms. Cross states that if entrepreneurial profit were appropriate, she would use a 12% rate, and Mr. Jones states that an 11% discount rate is reasonable if an entrepreneurial profit were included, the court will assume that Mr. Hawk would apply between a 12-14% discount rate.  With no useful contradiction of the rate used by Ms. Cross, the court will adopt an 11% discount rate.

Mr. Hawk does not discuss the appropriateness of an escalation in sales price during the absorption period.  In contrast, Ms. Cross' report contains a reasoned explanation for a delay in escalation of pricing for the first two years of the absorption period, followed by escalation of 2% per year for the remaining two years.  Mr. Jones does not dispute the appropriateness of the escalation set forth by Ms. Cross in his review report.  Therefore, the court will adopt a 2% per year escalation in pricing after the first two years of the absorption period.

The selling and miscellaneous expenses figures selected by the appraisers are almost identical.  The court adopts a 9% cumulative expense figure for the discounted cash flow analysis made up of a 6% selling rate and a 3% miscellaneous figure.

What remains for a determination of value is a selection of the appropriate per-lot retail value.  Ms. Cross has placed a $231,294 value on the Tier One lots.  She testified that she valued the lots "as is" and did not include any value for amenities which were not constructed.  She made a negative adjustment for market conditions, chose not to escalate the price for two years, and spent approximately three-and-a-half weeks visiting and studying the area and subject property.  She inspected the property by both foot and boat.  In her opinion, Bridgewater South is more desirable

than other subdivisions in the area because of its high elevations, the fact that it is not in a flood zone, and its wide lots. She made specific adjustments to each of the comparable waterfront sales used in her sale comparison analysis.  Mr. Jones, retained by Capital to review that decision, states that "the retail value for the Tier 1 lots at $231,294 appears reasonable based on the sales and listings."  Mr. Hawk, on the other hand, values what he designates as waterfront lots at $175,000. Mr. Hawk arrived at his retail price by evaluating the waterfront lots against what he considered to be comparable sales in the area.  His report generally depicts a Bath area market which has stabilized in the past few years with the sharpest decline in values occurring about four years ago.  Mr. Jones agrees that the market has been stable for the past couple of years.  Mr. Hawk chose not to make adjustments for size, location, passage of time, view, etc. between the subject property and comparables, and only physically inspected one comp – Bridgewater North, which he conceded was inferior in many respects to the debtor's property in Bridgewater South.  In light of his failure to visit the other comparables, Mr. Hawk was unable to assess whether they, too, were inferior to the subject property.  Based on its evaluation of the credibility and weight of the evidence, the court has no reason to dispute the retail value given to the Tier One lots by Ms. Cross and therefore will adopt that value  for Lots 19, 25, 26, 27, 28, 30, and 31.

Ms. Cross values the Tier Two lots at $227,325.  Since Mr. Hawk did not consider those lots waterfront, his value is $45,000.  The court cannot place much weight on that valuation, especially since it values lots which had at least some water view and access exactly the same as a completely interior lot, with no explanation for that decision.  That analysis severely tests the credibility of Mr. Hawk's report and testimony in that respect.  Mr. Jones does not opine as to what value should be given to these lots, but is concerned that the value given for Tier Two lots is too close to that

given for the premium Tier One lots.  The court shares that concern.  All the parties concede through their respective witnesses that appraisal is not an exact science, but based upon the exhibits introduced at the hearing which indicate more than adequate water access, views and frontage relating to these lots, the court believes that a 25% discount off of the premium lots value would properly reflect the value of the Tier Two lots for § 506 purposes.  The court therefore adopts a value of $173,470 for Lots 33, 34, 35, 36, 37, and 39.

The court will take a similar approach regarding the Tier Three lots and apply a 25% reduction to the Tier Two price to arrive at $130, 103 for Lots 13, 39, 40, and 41.  As for Lot 54, the interior, the court will adopt a value of $55,200, having been derived by Ms. Cross from duly adjusted comparables in the area.  Mr. Jones did not find fault with that valuation in his review report and stated that it was "within the range."

Now that the appropriate inputs for the discounted cash flow analysis have been determined, the analysis itself must be undertaken.  Therefore, within 10 days of the date of this order, the court directs the parties to submit a valuation for the Bridgewater South property to be surrendered using a discounted cash flow analysis comprised of the factors determined by the court above.  If the parties cannot agree on that value, separate valuations with supporting discounted cash flow analysis exhibits may be submitted to the court within that 10 day period.  Upon receipt of that value, the court will add it to the $350,000 value for the Bridge Lot to determine whether the combined values are equal to or exceed the claim of Capital as of the petition date.    If it does not, the court will undertake a similar review of the appraisals pertaining to the lots in Catnip Estates.

Capital is further directed to provide the court with a statement of post-petition interest, attorneys' fees and other costs through October 1, 2012, with a per diem interest factor by October 2, 2012.

**SO ORDERED**.

**END OF DOCUMENT**