**SO ORDERED.**

**SIGNED this 12 day of March, 2013.**



_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| **IN RE:** | **CASE NO.** |
| **BATH BRIDGEWATER SOUTH, LLC,** | **11-06817-8-SWH** |
| **DEBTOR** | |

### ORDER DENYING CONFIRMATION WITH RIGHT TO AMEND

Pending before the court is the matter taken under advisement in connection with the court's order of September 20, 2012: specifically, whether creditor Capital Bank, NA ("Capital") has a deficiency claim, and if not, whether the debtor's plan of reorganization should be confirmed pursuant to § 1129(b) of the Bankruptcy Code. Because all valuation and other confirmation testimony has been completed, the case is ripe for confirmation consideration. The court concludes that Capital does not have a deficiency claim so a cram down analysis has been undertaken, but the debtor's treatment of Capital's second, smaller claim (account ending 1869) ("Claim #2") does not satisfy the fair and equitable test of § 1129(b). For that reason, confirmation will be denied, but the debtor will be given leave to amend the plan.

## BACKGROUND

In the order of September 20, 2012, the court approved the debtor's disclosure statement and derived the inputs to be used in completing the discounted cash flow analysis necessary to a determination of the value of certain of the properties the debtor intends to surrender to Capital as treatment of Capital's first, and larger, claim (account ending 8427) ("Claim #1"), to wit: the Bridgewater South property.  See Order Regarding Disclosure Statement and Determination of Existence of Impaired Class (September 20, 2012) (hereinafter "September Order").[1]  In that order, the court directed the parties to "submit a valuation for the Bridgewater South property to be surrendered using a discounted cash flow analysis comprised of the factors determined by the court." Id. at 15.  Upon determination of that value, the September Order provided that the court would add the $350,000 stipulated value of the "Bridge Lot," which the debtor also intends to surrender to Capital, and then determine whether the combined values were at least equal to Capital's Claim #1 as of the petition date.  If not, the September Order stated that the court would undertake a review of the appraisals pertaining to lots in Catnip Estates, which the debtor intends to make available next for surrender if and to the extent necessary.

The specific posture of the question the court took under advisement was as follows:

> The debtor seeks confirmation pursuant to § 1129(b), the cram-down provision of the Bankruptcy Code.  However, the court must first consider the threshold issue of whether there is an accepting impaired class which would allow the court to apply the cram-down standards.  Inasmuch as the debtor believes that

---

[1] There are other outstanding issues in this vigorously litigated case, including Capital's appeal of the September 20 Order, in which Capital asserts that the court's valuation analysis is flawed in several respects. The court already has determined that Capital's appeal does not preclude the court from proceeding with the matters before it that are distinct from the appeal.  See Order on Status Conference (Nov. 6, 2012) and Order Denying Capital Bank's Motion to Reconsider (Jan. 18, 2013).

> Capital is oversecured, it has not provided a class for a Capital deficiency claim. The debtor has indicated that it is willing to surrender as much of its property as necessary, exclusive of excepted property, to satisfy the secured claim of Capital. If the value of all of the offered property is sufficiently high such that it is equal to or greater than the amount of Capital's claim, Capital will have no deficiency, and an accepting impaired class exists: Class 6, which includes all general unsecured claims in the approximate amount of $53,179.05. If, however, some part of Capital's claim is unsecured, that portion will be added to the general unsecured claims, and an amount as low as $27,000 would, under § 1126, enable Capital to carry the Class 6 vote and to reject the plan. In that event, there would be no accepting impaired class as required by 11 U.S.C. § 1129(a), and the court could not proceed to an analysis under § 1129(b) without modification of the plan.
>
> To determine whether there is an impaired accepting class capable of forcing the matter to cramdown, the court need only consider valuation testimony to the extent necessary to determine the existence of any deficiency claim in excess of $27,000. Capital's position is that even if the debtor surrendered *all* of the properties securing the debt, there still would be a deficiency. The debtor counters that surrender of the Bridge Lot (which the parties agree has a value of $350,000 for credit purposes) and the remaining lots in Bridgewater South serving as Capital collateral (excepting Lot 21) will fully satisfy Capital's claim. If the court finds otherwise, the debtor has offered additional properties for surrender:
>
> The Plan (as clarified during the confirmation hearing) proposes to satisfy Capital's large claim – designated as "(a)" in the Plan and referred to as "account ending in 8427 – by deeding properties to Capital, free and clear of all liens, in the following order, up to the amount necessary to fully satisfy Capital's large claim and thereby give Capital the indubitable equivalent of this claim:
>
> > a. 1.2 acre parcel on Highway 92 (the "Bridge Lot");
> > b. Lots in Bridgewater South, with the exception of Lot 21;
> > c. Lots in Catnip Estates;
> > d. Excess land in Catnip Estates; and
> > e. Bridgewater West land.

September Order at pp. 2-4 (quoting Debtor's Sum. of Evidence & Closing Args. at p.1 ¶ 4.)

The parties could not agree on the discounted cash flow value of the Bridgewater South lots resulting from the court's initial findings on inputs and, with the court's permission, separate valuations were submitted by each. The court will first resolve the remaining valuation issues regarding Bridgewater South. A discussion of other confirmation issues presented to the court will

follow, which include those arising under § 1129(a), as well as those concerning the remaining issues arising out of the debtor's treatment of Capital's Claim #1 and the treatment of Capital's Claim #2.

The debtor's plan treats Capital's Claim #2 in Class 4. Claim #2 is based on Capital's mortgage lien on Lot 4 of Catnip Estates which secures a promissory note executed by the Baldwin Irrevocable Family Trust (the "Family Trust") in favor of Capital in the original principal amount of $200,000.00. As of December 2, 2011, the amount due and owing on the note by the Family Trust was $203,810.93. See Agreed Order on Debtor's Motion for Approval of Residential Property Lease, March 5, 2012, Docket Entry No. 119 (the "Lease Order"). As treatment of Claim #2, Capital will retain its lien on the property until the secured claim is paid in full. The debtor will have thirty-six months to liquidate the property during which time interest will accrue at 5% per annum but no payments will be made to Capital unless the property is sold during that marketing period. If the property is not sold by the end of the marketing period, the outstanding balance will be paid with a twenty-year amortization and five-year call at a 5% interest rate.

## DISCUSSION

1. The Existence of a Capital Deficiency Claim

On September 27, 2012, in response to the directives contained in the September Order, the debtor provided to the court a valuation prepared by appraiser Karen Cross, which established a value of $2,335,000 for the Bridgewater South property to be surrendered pursuant to the plan. Capital provided two valuation reports prepared by appraiser Matt Hawk: The first discounted cash flow analysis calculated the present value of the Bridgewater South property assuming that the lots would be sold in the beginning of each year, with a rounded value of $2,511,000; the second

assumed the lots would be sold at the end of the period, with a rounded value of $2,262,000. The court recognizes that the discounted cash flow analysis must assume some definitive timing of the sale of certain lots and appreciates Capital providing it with a range of values which encompasses that variable. Capital's appraiser does advise the court that "[t]he present value of the lot sales would fall between these two values." See Attachment to letter from Matt Hawk to Mr. Chuck McGill, dated September 27, 2012. The average of the range given by Mr. Hawk is $2,386,500. The analysis generated by the debtor's expert, Ms. Karen Cross, falls within Mr. Hawk's range, but is a bit lower. Adopting the more conservative number submitted by Ms. Cross, the court finds the value of the Bridgewater South property offered for surrender pursuant to the plan to be $2,335,000.

Accordingly, based on the calculations discussed above, the court determines that the value of the Bridgewater South property, when combined with the value of the Bridge Lot, is $2,685,000. Capital's claim as of the petition date is $ $2,596,186.85.[2] Thus the combined value of the Bridge Lot and Bridgewater South property exceeds Capital's Claim #1 as of the petition date. That being the case, Capital has no deficiency claim, and therefore, an impaired accepting class exists. If the other provisions of § 1129(a) are satisfied, the debtor may proceed to cram down.

2. <u>Additional Section 1129(a) Issues</u>

Capital asserted several objections to confirmation pursuant to § 1129(a). It is Capital's position that the plan is not feasible (§ 1129(a)(11)), was not filed in good faith (§ 1129(a)(3)), and

---

[2] In accordance with the court's request, Capital filed a Payoff Statement as of October 1, 2012, stating that its claim as of that date, including interests and costs, was $3,174,414.14. The Payoff Statement also provided a break down of the claim as of the petition date, and that number is used herein.

does not pass the best interest test (§ 1129(a)(7)). The court will evaluate each of these objections in turn.

<u>Feasibility</u> - In essence, Capital contends that because "[t]he debtor is wholly incapable of paying quarterly bankruptcy fees; closing costs or recording fees associated with a transfer of the Real Property....." the plan is not feasible. The court has reviewed the docket and it reveals that the debtor has paid its quarterly fees for each quarter that it has been in chapter 11. The monthly reports indicate that the debtor has approximately $12,000 in its bank account with Capital Bank and $6,000 in its bank account with Southern Bank.[3] In essence, the plan proposes payments to creditors upon the sale of its remaining property after surrender of portions of its property to its Class 4 and 5 creditors. Closing costs and the like will be paid out of such sales. The debtor's plan does not require significant payments outside the sale of its properties and therefore the court finds that the debtor will be able to make those payments and has met the feasibility standard. See <u>In re Bumgardner</u>, Case No. 10-09785-8-SWH, 2013 Bankr. LEXIS 747, at *15 (Bankr. E.D.N.C. Feb. 28, 2013) ("Section 1129(a)(11) does not require a debtor to guarantee his plan will be successful-'the possibility that a plan may fail is not fatal-but a plan must be supported by adequate evidence that some reasonable assurance of success exists.'" (<u>quoting</u> <u>In re Gyro-Trac (USA), Inc.</u>, 441 B.R. 470, 483 (Bankr. D.S.C. 2010)).

<u>Good Faith</u> - Capital's contention that the plan was not filed in good faith is based upon its overriding position that partial dirt for debt plans can never be filed in good faith. The propriety of such plans in the right circumstances, i.e., those which pass the fair and equitable test of § 1129(b), is not subject to question in this district. <u>SunTrust Bank v. Bannerman Holdings, LLC (In re</u>

---

[3] Capital claims an interest in the monies deposited in the Capital bank account.

Bannerman Holdings, LLC), Case No. 7:11-CV-00009-H, 2011 U.S. Dist. LEXIS 153502 (E.D.N.C. Sep. 30, 2011); In re Sailboat Props., LLC, Case No. 10-03718-8-SWH, 2011 Bankr. LEXIS 1316, 2011 WL 1299301 (Bankr. E.D.N.C. March 31, 2011).  Therefore, Capital's good faith arguments will be assessed as part of the court's § 1129(b) evaluation.

  Best Interests Test - Again Capital's argument is based upon its contention that a partial dirt for debt plan can never put it into the same position as it would be in a chapter 7 liquidation where it would be allowed to foreclose upon its collateral.  Section 1129(a)(7) requires that the plan provide a creditor with as least as much as it would have received in a chapter 7 liquidation.  If Capital receives the surrender of that amount of collateral which would give it the indubitable equivalent of its secured claim, the court believes that the § 1129(a)(7) standard is met.  Capital further argues that  partial surrender deprives it of interest on its claim while it liquidates the collateral.  But such would be true if all of its collateral were to be surrendered to it, and Capital can certainly not be arguing that a complete surrender of its collateral would not give it at least what it would receive in a chapter 7 liquidation.  Finally, Capital refers to the holding costs it must incur while it attempts to liquidate the surrendered collateral.  The court notes that these very same holding costs are taken into consideration by both the debtor's and its appraisers in arriving at their valuations and thus would be considered in arriving at an indubitable equivalence finding.

  The court finds that the provisions of § 1129(a) have been satisfied, except for § 1129(a)(8), and will therefore move on to cram down of Capital's claims under § 1129(b).

3.  Cram Down

  At least one impaired class, Class 6, has accepted the plan, so the court "may confirm the plan notwithstanding [Capital's] objection if the plan does not discriminate unfairly and is fair and

equitable" to Capital. In re Bannerman Holdings, LLC, 2010 Bankr. LEXIS 3752, at *7, 2010 WL 4260003, at *2 (Bankr. E.D.N.C. Oct. 20, 2010), vacated on other grounds, SunTrust Bank v. Bannerman Holdings, LLC, 2011 U.S. Dist. LEXIS 153502. The treatment of a secured creditor "may be deemed fair and equitable if it satisfies one of the three criteria set forth under §1129(b)(2)(A)."[4] In re Bannerman Holdings, LLC, 2010 Bankr. LEXIS 3752, at *7. In this case, as its treatment of Capital's Claim #1, the debtor proposes to surrender to Capital a sufficient amount of its properties to provide for Capital's realization of the "indubitable equivalent" of its claims. 11 U.S.C. § 1129(b)(2)(A)(iii).

Thus, we plunge again into the briar patch of indubitable equivalence. To recap, the court has established a value of $2,335,000 for the Bridgewater South property and the parties have stipulated to a value of $350,000 for the Bridge Lot for a combined value of $ 2,685,000. Since the value of only two of the five properties constituting Capital's collateral would, by themselves, exceed Capital's claim on the petition date, Capital is clearly an oversecured creditor and is entitled to post-petition interest and costs pursuant to § 506(b). Again, referring to the Payoff Statement provided by Capital, the per diem interest on the loan is $1,075.18, and therefore interest through March 8, 2013 is $591,349.00, costs through October 1, 2012 are $157,831.91 resulting in a total claim of $3,345,367.76, plus additional costs, including attorneys' fees from October 1, 2012. It falls to the court, then, to determine the extent to which additional property must be surrendered to

---

[4] In its objection to the plan, Capital asserted that the plan violated the absolute priority rule found in § 1129(b)(2)(B). However, in light of the court's ruling that Capital does not have an unsecured claim, and therefore no objecting unsecured classes exist, the absolute priority rule is inapplicable.

Capital in order to provide it with the indubitable equivalent of its Claim #1 as of the confirmation date.[5] It is noteworthy at this point to recall the court's observation in the September Order:

> Different issues are presented to the court if the debtor can then proceed to cramdown under § 1129(b): indubitable equivalence, and whether the treatment of the lender is fair and equitable. So, while the court may determine that a deficiency does not exist for § 1129(a) purposes, it is conceivable that the surrender of property may not satisfy § 1129(b).

September Order at 7. The determination of the value of the properties offered by the debtor for surrender to Capital and the extent to which the debtor will surrender those properties, is most appropriately and effectively made in the context of whether the debtor's treatment of Capital is fair and equitable and is not limited to the valuation made by the court in determining the existence of a deficiency claim. That said, because the court employed a conservative analysis in determining the value of the Bridgewater South property, the $2,335,000 value will be used in the indubitable equivalent calculation. See In re 3G Properties, LLC, Case No. 10-04763-8-JRL, 2011 Bankr. LEXIS 4634, at *16, 2011 WL 5902504, at *6 (providing that a conservative approach must be taken for valuations in determining whether the property proposed to be surrendered constitutes the indubitable equivalent of the creditor's claim) (quoting In re Bannerman Holdings, LLC, 2010 Bankr. LEXIS 3752, at *12).

The court has been asked to next consider whether the surrender of the Catnip Estate Lots, or some portion of them, when combined with the Bridge Lot and the Bridgewater South property will give Capital the indubitable equivalent of its Claim #1. Capital's appraiser, Mr. Matt Hawk,

---

[5] The court has undertaken the task of determining what amount of Capital's collateral should be surrendered to it to satisfy § 1129(b)'s indubitable equivalent requirement in this case. In the future, the court will decline such a determination and will insist that the specific amount of property to be surrendered is identified by the proponent of the plan.

values the 28 lots at $297,000, while the debtor's appraiser, Ms. Karen Cross, values those lots at $1,180,000.[6]  Mr. Hawk assumes a retail lot price of $40,000, an absorption period of fifty-five[7] quarters, a discount rate of 25%,[8] selling costs of 6%, a real estate tax rate of $0.680 and administrative costs of 1%, in arriving at his value.  Mr. Hawk values the lots as interior or non-waterfront lots.  Ms. Cross assumes a retail lot price of $70,000, a five year absorption period, a discount rate of 11%, selling costs of 6%, taxes and miscellaneous costs of 3%, and a developer's profit of 12% (in her alternative appraisal value only).  Ms. Cross values the lots as water access lots.  Assuming, *arguendo*, that a developer's profit is appropriate, there are four main differences in the appraisals: the retail lot price ($70,000 v. $40,000), the absorption rate (fifty-five quarters v. twenty quarters), the discount rate (11% (made up of only a discount rate) v. 25% (made up of a discount rate and a developer's discount), and the lot quality (non-waterfront v. water access).

Mr. Hawk reviewed average sale prices in five comparable neighborhoods to arrive at his "reconciled lot price" of $40,000.  The appraisal does not contain any significant comparison of the lots in those neighborhoods to those in Catnip Estates, and makes no adjustments for differences, so it is difficult to determine how Mr. Hawk arrived at his reconciled lot price.  See Appraisal of Matt Hawk dated as of December 31, 2011 at 57; Amendment to Addenda of Appraisal Report dated January 5, 2012.  Mr. James Gurley of Credit Risk Management, LLC testified on behalf of Capital

---

[6] Ms. Cross values the 28 lots at $1,180,000 with a discount of 12% for developer's profit and at $1,360,000 without such discount, a $180,000 difference.

[7] Although the caption of Mr. Hawk's discounted cash flow analysis indicates a thirteen quarter absorption period, the actual calculation was performed using a fifty-five quarter absorption period.

[8] The 25% figure is a combination of discount rate and developer's profit.  Neither Mr. Hawk's appraisal nor his testimony could provide the court with a basis for separating out the two components.

as well, and prepared a Memorandum dated May 11, 2012, in which he used "an average CRM value" of $50,000 for non-waterfront lots in his review of the respective appraisals of Mr. Hawk and Ms. Cross.[9]

Ms. Cross selected five comparable sales occurring between September 2009 and February 2012. She then adjusted those sales for many different variables, including, market conditions, location, size, amenities, etc., to arrive at a lot value of $70,000. Ms. Cross compared the debtor's Catnip Estates property to other water access lots, based on her assumption that the lots would have access to Bath Creek through a reserved common area water access between lots 21 and 22. The court finds Ms. Cross' valuation technique and conclusion most persuasive and will adopt that lot value as an appropriate input for the discounted cash flow analysis. See In re 3G Properties, 2011 Bankr. LEXIS 4634, at *20 ("'When two appraisal reports conflict, a court must determine the value based on the credibility of the appraisers, the logic of their analys[es] and the persuasiveness of their subjective reasoning.'") (quoting In re Sailboat, 2011 Bankr. LEXIS 1316, at *17).

With regard to absorption rates, both Ms. Cross and Mr. Gurley utilized a five year period, while Mr. Hawk employed a fourteen year period. Capital provided no explanation as to why the absorption rates assumed by its own appraisers were vastly different from each other (with Mr. Gurley using an absorption rate of five years, thus in agreement with Ms. Cross, and Mr. Hawk using a significantly longer absorption rate of fourteen years). Because two of the appraisers, one of which was tendered by Capital, agreed on an absorption rate of five years, and because the court

---

[9] Capital also introduced testimony from Mr. Robert Earl Jones who reviewed the appraisal prepared by Ms. Cross. The court could distill only one significant criticism by Mr. Jones of Ms. Cross' report and that was of her use of a per acreage price as opposed to a per lot price in arriving at her valuation opinion.

finds Mr. Hawk's appraisal less persuasive on that point, the court will accept the five year period as the appropriate absorption component to the discounted cash flow analysis. See, e.g., September Order at pp. 11-14 (expressing the court's doubts as to the reasoning, analysis, weight and thoroughness of Mr. Hawk's appraisal, especially when compared to the appraisal prepared by Ms. Cross regarding the Bridgewater South property).

The main difference between the discount rates employed by Mr. Hawk, Mr. Gurley and Ms. Cross is the application of an additional discount for developer's profit in the Hawk and Gurley opinions of value. Ms. Cross opined that it was not appropriate for a developer's profit to be included in the analysis because the lots were fully improved, but gave both values for the court's consideration. If the court were to accept the propriety of the inclusion of a developer's profit into the analysis, the discount rates line up as follows: Hawk - 25%, Cross - 23%, and Gurley - 22.5% (the result of an average of 20% and 25%). Ms. Cross' combined discount rate falls nearly half way between those of Capital's two expert witnesses, is actually three points higher than Mr. Gurley's low range, and is a reasonable combined rate to be used for the discounted cash flow analysis. The court declines to specifically determine the propriety of the application of a developer's discount to a valuation of the Catnip Estate lots because it is unnecessary to do so in this case - there is sufficient equity in the property to satisfy the indubitable equivalent standard whether or not the discount is applied. The court therefore finds that the value of those lots falls within the range of $1,180,000 and $1,360,000.

The combined values of the Bridge Lot ($350,000), Bridgewater South ($ 2,335,000) and the Catnip Estate lots ($1,180,000-$1,360,000) is between $3,865,000 and $4,045,000. The amount of Capital's claim through March 8, 2013 is $3,345,367.76, plus additional costs, including

attorney's fees from October 1, 2012 through March 8, 2013. The court assumes that some additional costs have been incurred by Capital since October 1, 2012, and that those costs may be substantial in light of the various matters that have come before this court during that period. The court estimates that there is a range of $660,000 to $800,000 between the combined values of the Bridge Lot and the Bridgewater South property and the Capital claim as of March 8, 2013. Whatever end of that range is chosen, there is too much value in the Catnip Estates lots to require that all 28 of them be surrendered to Capital in order to satisfy the indubitable equivalent test. Keeping in mind that any valuation to determine satisfaction of the indubitable equivalent test must be conservative, In re Bannerman Holdings, LLC, 2010 Bankr. LEXIS 3752, at *12, the court holds that the debtor must surrender 18 of the 28 lots to Capital in order to satisfy § 1129(b)(2)(A)(iii). Accordingly, with the surrender of the Bridge Lot, the Bridgewater South property and 18 of the Catnip Estates Lots, the court concludes that Capital will receive the indubitable equivalent of its secured claim and the plan's treatment of Capital is thus fair and equitable as to Capital's Claim #1. All three expert witnesses who rendered an opinion of value on the Catnip Estate lots valued all 28 lots equally. Therefore, the court will allow the debtor to choose which of the 18 lots in Catnip Estates it will surrender to Capital.

      The plan's treatment of Capital's Claim #2, however, is not fair and equitable. To begin, title to Lot 4 of Catnip Estates—the property serving as collateral for the promissory note executed by the Family Trust—was effectively transferred to the debtor pre-petition and is therefore property of the estate. See Williams v. Bd. of Education, 284 N.C. 588, 594, 201 S.E.2d 889, 893 (1974) (citing New Home Building Supply Co. v. Nations, 259 N.C. 681, 131 S.E.2d 425 (1963)) (discussing the requirements for an effective conveyance of real property); 11 U.S.C. § 541(a)(1) (defining property

-13-

of the estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case"). Capital's interest in the deed of trust on this property constitutes a "claim" against the debtor as that term is defined in 11 U.S.C. § 101(2), even though the debtor is not personally liable to Capital. Johnson v. Home State Bank, 501 U.S. 78, 111 S. Ct. 2150 (1991); In re Thompson, 454 B.R. 486, 488-492 (Bankr. D. Idaho. 2011); In re KM Allied of Nampa, LLC, 2011 Bankr. LEXIS 1674, 2011 WL 1434915, at *2-4 (Bankr. D. Idaho April 14, 2011). This "claim" against the debtor may be treated and restructured in the debtor's plan of reorganization subject to the applicable requirements set out in the Bankruptcy Code.[10]

The negative amortization imposed upon Capital as part of its treatment of Claim #2 is not fair and equitable based on the ten-factor test that has been applied previously by this court and others for satisfaction of the requirements of 11 U.S.C. § 1129(b)(1). See In re 3G Properties, LLC, 2011 Bankr. LEXIS 4634, at *24-28; 2011 WL 5902504, at *9-10 (Bankr. E.D.N.C. July 12, 2011); In re Northern Outer Banks Associates, LLC, 2010 Bankr. LEXIS 3974, at *8-11, 2010 WL 4630348, at *25-34 (Bankr. E.D.N.C. Nov. 8, 2010) (discussing the ten-factor test applied by courts and noting that "'negative amortization is highly suspect' when evaluating whether the plan is 'fair and equitable' under 11 U.S.C. § 1129(b)(1)") (citing In re Oaks Partners, Ltd., 141 B.R. 453, 456 (Bankr. N.D. Ga. 1992)). The plan provides for a thirty-six month marketing period during which interest will accrue at 5% per annum but no payments will be made to Capital unless the property is sold during that period. If the property is not sold by the end of the marketing period, the

---

[10] The plan's treatment only modifies Capital's interest in the deed of trust on Lot 4 of Catnip Estates and Capital's ability to look to this property to recover the amounts owed on the promissory note. The plan does not modify Capital's rights against the Family Trust which is personally liable to Capital as the obligor of the promissory note.

outstanding balance will be paid with a twenty-year amortization and five-year call at a 5% interest rate. The court finds that this treatment does not adequately compensate Capital for the risks shifted to it if the property goes unsold within the marketing period or any time thereafter.

The fact that Capital has previously been, and may currently be, receiving rental income generated from the property does not satisfy the requirement that the plan itself provide fair and equitable treatment to Capital, as the holder of Claim #2. The Lease Order, entered by the court on March 5, 2012, approved the lease of Lot 4 of Catnip Estates pursuant to which all rental payments—$1,000 per month—would be sent to Capital for application to the promissory note. See Lease Order, March 5, 2012, Docket Entry No. 119. The Lease Order approved a lease that would begin February 9, 2012 and expire on February 9, 2013. The court is unaware of whether the property is still being leased and if Capital is still receiving rental payments, but even if the bank were, the debtor's plan fails to either assume the lease or provide for the continued payments of $1,000 per month to Capital. The plan itself must provide for such treatment. It is noteworthy that the Lease Order specifically refutes any obligation under the promissory note by the debtor, evidencing an intent by the debtor not to be responsible for any continuing payments, either through lease proceeds or otherwise.

Finally, the plan is unnecessarily vague as to the continuing validity of Capital's lien on Lot 4 of Catnip Estates once other properties are surrendered to Capital in accordance with the plan's treatment of Capital's Claim #1. Clarification of the retention of the lien on Lot 4 would be required as part of the fair and equitable treatment of Claim #2.

## CONCLUSION

The debtor's plan satisfies the requirements of § 1129(a), except for § 1129(a)(8). The plan satisfies the cram down requirements of § 1129(b) as to the treatment of Capital's Claim #1 with the surrender of the Bridge Lot, the Bridgewater South property and 18 lots in Catnip Estates. The debtor has failed to satisfy § 1129(b) as to the treatment of Capital's Claim #2. On that basis, confirmation will be denied. However, because the court believes that the debtor may be able to modify the plan in a manner which will satisfy the requirements of § 1129(b), it finds that there is a reasonable prospect for a successful reorganization and will allow the debtor thirty days to amend the plan.[11]

**SO ORDERED**.

**END OF DOCUMENT**

---

[11] The Class 5 claim of Ruth Smith Waters voted to accept the plan so the court is not required to evaluate that treatment under § 1129(b). However, the court notes that the treatment includes cram down verbiage and is dependent upon the court's indubitable equivalent determination regarding Capital's Claim #1. Clarification of that treatment may be warranted in an amended plan.